**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**


**Bridget E. Lyons,**

*Plaintiff,*

**v.**                                                  **Case No. 3:12-cv-142**
                                                       **Judge Thomas M. Rose**

**Secretary of the Air Force,**

*Defendant.*

---

**ENTRY AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DOC. 35, AND TERMINATING CASE.**

---

Pending before the Court is Defendant's Motion for Summary Judgment. Doc. 35. Therein, Defendant, Secretary of the Air Force, requests that the Court grant summary judgment on Plaintiff Bridget E. Lyons's claims of gender discrimination and hostile work environment. Because Plaintiff has no direct evidence that Defendant's decisions not to promote Plaintiff were motivated by gender animus, and because she has no evidence to disprove Defendant's asserted non-discriminatory reasons for promoting others, and because there is no evidence of a hostile work environment, Defendant's motion will be granted.

**I.      Background**

Plaintiff Bridget E. Lyons has worked for Defendant at the GS-14 pay level since 2002. She alleges gender discrimination and hostile work environment stemming from her efforts to

1

achieve a promotion to the GS-15 level.   The Court will recite the facts Plaintiff cites as relevant to her claims.

In May, 2007, during two meetings, Supervisor Peter Ditalia told Lyons he would see her "finished in the office." (Affidavit of Bridget Lyons, Pl. Ex. A: May 1-2, 2007 emails from Lyons, Pl. Ex. B). The only witness to this first statement was then Colonel Thomas Doyon. In a Memorandum for Record, dated January 28, 2010, some three years later, Doyon described what occurred in this meeting. According to Doyon, while admitting the statement "could have been made," Doyon blamed Lyons for what occurred and considered punishing her. (Doyon Memorandum for Record, Pl. Ex. E).

In September 2009, Col. Doyon denied Lyons a promotion. Lyons alleges Doyon pre-selected a man, accelerated his promotion, created after-the-fact criteria, which he did not meet, and then provided varying reasons to Lyons for her non-selection, including the male selectee's age, seniority, adding that Doyon thought Lyons would have no interest in this "paper-pushing" position. When Lyons questioned this promotion, management then downgraded her on her next appraisal. (See January 19, 2010 emails from Dankovich et al, Pl. Ex. F). When Lyons met with Doyon on her appraisal in January 2010, Lyons was told that her "career progression" in AFMCLO/JAN was done, and she should just be happy that she had a job. (See Pl. Ex. G).

In March 2010, Lyons received an offer of a lateral GS-14 from Gregory Petkoffat Air Force Materiel Command. (AFMC/JA) (March 2 & 29, 2010 emails from Lyons, Pl. Ex. H). Lyons discussed the offer with John Thrasher, Director of the Air Force Materiel Command Law Office (AFMCLO), telling him of the January 2010 statements along with issues in

2

AFMCLO/JAN and stating that this offer would allow her to leave AFMCLO/JAN and the problems there. (See Pl. Ex. A).1 While Thrasher halted Lyons' AFMCLO/JAN discussions, he did state the offered AFMC/JA position had to be competed and encouraged her to apply. Thrasher followed up the encouragement with an e-mail in April 2010, regarding the AFMC/JA position. (April 14, 2010 email from Thrasher, Pl. Ex. 1). In April 2010, Lyons applied for the position, and in May 2010, her application was accepted. (Confirmation of Submission, Pl. Ex. K; May 24, 2010 email from Vacancy, Pl. Ex. L).

However, the position was cancelled by Thrasher, who had represented to Lyons that he "controlled" the hiring. (See Pl. Ex. A). No further explanation was provided to Lyons. (July 12, 2010 emails from Lyons, Pl. Ex. M).

Less than a week later, on July 16, 2010, Lyons used the wrong form for leave, requesting sick leave when she intended to request annual leave. That same day, the local news reported that Lyons was hosting an event at her house for Ohio Governor Strickland. Doyon and Klein, knowing Lyons to be out on sick leave, discussed this with Klein. Ditalia and Klein requested Lyons' leave balances from the timekeeper, Brenda Williams, who stated, "They're always digging." (July 20, 2010 email from Brenda Williams, Pl. Ex. N). Williams states the two met with Doyon in his office to discuss how they had gotten something on Lyons. (Williams Declaration, Pl. Ex. P).

On July 19, 2010, Doyon and Nike Nihiser, Lyons' supervisor, met with her. Despite Lyons' apology, (July 19, 2010 email from Lyons, Pl. Ex. Q), and her submitting a corrected leave

---

1 Defendant would have the Court strike Plaintiff's affidavit, characterizing it as, "self-serving and serv[ing] no purpose given the prior testimony given under oath in the form of a deposition." Doc. 41 at 4. Defendant cites no authority for striking an affidavit given after a deposition. The authority is to the contrary: "Self-serving affidavits can indeed be a legitimate method of introducing facts on summary judgment." *Widmar v. Sun Chemical Corp.*. – F.3d --, 2014 WL 6467287, *1, & n.1 (7th Cir. 2014). A party protects itself against self-serving affidavits by means of thorough depositions. See *United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 303 (6th Cir. 1998) ("[A] party cannot avoid summary judgment through the introduction of self-serving affidavits that contradict prior sworn testimony.").

slip, which Nihiser accepted, (Lyons' Standard Form 71, dated 7-19-10, Pl. Ex. R), management charged her as being Absent Without Leave and warned of "further action," as it deemed appropriate. (July 21-30, 2010 emails from Lyons, Pl. Ex. S).

On August 2, 2010, Lyons filed a Grievance against management with Thrasher (AFMCLO) (August 2, 2010 Formal Grievance, Pl. Ex. T), and on August 16, 2010. Thrasher was informed of the Grievance. (Aug. 16, 2010 Memorandum to AFMCLO/CL, Pl. Ex. U). On September 9, 2010, Thrasher met with Lyons and expressed his anger at Lyons for having taken the issue outside the office. During this conversation, Lyons recalls,

> in regard to my future ability to be promoted, namely your comment that I "have previously asked to be promoted to management positions within the office," it was indicated that this situation in regard to my use of leave on this one particular occasion will be considered negatively in such decisions, and my having any future promotions was then called into question.

(September 10, 2010 email from Lyons, Pl. Ex. V).

On October 27, 2010, Lyons filed a formal EEO Complaint concerning the discipline administered over her absence to host the Governor. (Oct. 27, 2010 Complaint of Discrimination, Pl. Ex. W). On November 1, 2010 in his Grievance Decision, (Nov. 2, 2010 Memorandum for AFMCLO/JANA Lyons, Pl. Ex. X), the Director of the Air Force Material Command, John Thrasher, denied Lyons' request and concluded there was no harassment in the office. (Summary of Thrasher's Statement to EEO, Pl. Ex. Y).

On November 12, 2010, despite Lyons informing her in a September 2010 meeting of the selective enforcement of a regulation, Colonel Jennifer Martin issued a Letter of Reprimand. (Nov. 12, 2010 Memorandum for AFMCLO/JANA Lyons, Pl. Ex. Z).[2]

---

2 Lyons would have the Court acknowledge her claim in her affidavit that Ed Babbit said to her that he thought she

4

On November 24, 2010, Lyons filed a Grievance against Thrasher and management with General Dwight Creasy at AFMC/JA (Nov. 24, 2010 Formal Grievance, Pl. Ex. AA), who was informed of the Grievance on December 8, 2010. (Dec. 8, 2010 Memorandum to HQ AFMC/.JA, Pl. Ex. BB). In response, Creasy sent Colonel Thomas Coutere, a labor attorney, from his office to investigate. Lyons met with Coutere on January 4, 2011 and later sent an e-mail, providing requested witnesses. (Jan. 6, 2011 emails from Lyons, Pl. Ex. CC). During their conversation, Lyons' prior EEO activity was noted. (See Pl. Ex. A).

It was against this background that the hiring process for the position that forms the basis of Lyons' first claim took place. On November 29, 2010, the AFMC/JA GS-14 Attorney-Advisor position was posted on the USA Jobs website. (Announcement of Attorney Advisor: 9Xll-409243, Pl. Ex. FF). This announcement mirrored the April 2010 announcement for the same position, the one, Petkoff had offered Lyons (Pl Ex. A) and for which both Thrasher (and Nihiser) encouraged Lyons to apply. (March 7, 2011 emails from Lyons et al, Pl. Ex. GG).

Lyons' application was accepted and sent on to AFMC/JA (Jan. 14, 2011 email from Vacancy 409243, Pl. Ex. HH); thus, making her qualified for this position. (Def. MSJ, Exhibit 6, attached as Def. Ex. II). On January 14, 2011, Creasy appointed a Selection Committee (Jan. 14, 2011, Memo for Record, Pl. Ex. JJ). Contrary to the announced criteria. (See Pl. Ex. FF), this committee focused and developed questions based on fiscal law. (Attorney Advisor Interview Questions, Pl. Ex. KK; Zimmerle Depo. Tr. @ p. 42, Lines 11-14).

The committee interviewed individuals, but no documents, such as applicants' resumes, resumes' scoring, interviewees' ranking, and other deliberative documents, exist to show how that

---

was subject to a double standard. See Pl. Ex. A at 11, Doc. 38-2, PageID 645, ¶ 11. Under Fed. R. Civ. P. 56(e), evidence submitted in opposition to a motion for summary judgment must be admissible. Hearsay evidence must be disregarded. *U.S. Structures, Inc. v. J.P. Structures, Inc.,* 130 F.3d 1185, 1189 (6th Cir. 1997).

determination was made. Lyons was not interviewed for this GS-14 lateral position. (See Pl. Ex. A; USA Staffing, Pl. Ex. LL). Rather, the committee interviewed individuals who had less government contracting experience, including Pritchard, who was awarded the position, had five years of experience compared to Lyons' 15 years. (See Lyons Depo. Tr.@ p. 126, Lines 10-25; p. 127, Lines 1-14).

On March 22, 2011, Brigadier General Dwight Creasy denied Lyons' grievance concerning how her use of leave to host the Governor was handled:

> a. I find no evidence to support your contention that Col. Martin's decision to reprimand you was based on selective enforcement of AFI 36-815. The facts indicate that you were not in an authorized leave status on 16 July 2010. The purposes for which use of sick leave is authorized are clearly outlined in the AFI, and in no section of this guidance is it permissible to use sick leave interchangeably with or in place of annual leave. As a long time Air Force civilian employee and attorney, you knew or should have known the rules for requesting leave and the appropriate use of sick leave. You intentionally attempted to utilize sick leave for an unauthorized and inappropriate purpose and were appropriately disciplined for that misconduct.

> b. I find no evidence to support your contention that Col. Martin's decision to reprimand you constituted harassment by management in the AFMCLO. Col. Martin reviewed the facts and circumstances of your case and independently rendered her decision without either input or pressure from any other managers in the AFMCLO. Her decision was based on her impartial finding that you had inappropriately used sick leave, and that this type of leave abuse and lack of personal integrity required corrective action in the form of a reprimand. This action was solely based on a reaction to your misconduct, rather than an effort to harass you in any way.

(Memorandum for AFMCLO/JANA, Lyons, Pl. Ex. PP). Creasy stated his assessment of Lyons' work:

6

> He stated that Ms. Lyons' work reputation is good, and if he were going to give her a letter grade on her performance it would be at the grade of B. He stated that he is not aware of anything either outstanding or negative about her on her work performance. Gen. Creasy stated that if he had another job opening, and Ms. Lyons applied and was recommended for the position by the hiring committee, he would hire her.

Pl. Ex. EE.

Lyons's second claim stems from another vacancy. On February 16, 2011, Wilcox e-mailed current employees notice of a vacancy announcement for an AFMCLO/JANS GS-15 position. (February 16, 2011 email from Wilcox, Pl. Ex. QQ). The stated criteria were: supervisory experience and major weapon acquisition experience. (See Exhibit QQ). On February 18, 2011, Thrasher appointed the Selection Committee. (Memo for Record, dated Feb 18, 2011, produced during discovery, attached as Exhibit RR). Lyons was notified on March 15, 2011, that she was selected to interview for the position. (March 15, 2011 email from Wilcox, Pl. Ex. SS). Despite the announced selection criteria of supervisory experience and acquisition law experience, neither topic was addressed in the interview nor stated as the rationale for the ultimate selection for this position. Rather, as Martin told Lyons, the selection criteria used was that Ken Pippen was "an easy lateral." Also, according to Martin, while the committee recommended Pippen, it was Thrasher who actually made the decision to award the position to Pippen. (March 30, April 1, and April 5, 2011 emails from Lyons, Pl. Ex. TT), and he was named to the position. (Request for Approval, Pl. Ex. UU).

The facts forming the basis of Lyons' third claim soon followed. A GS-15 position in AFMC/JAQ under Creasy opened with Pippen's departure. (April 5, 2011 email from Wilcox, Pl. Ex. VV). The announced criteria included experience with service contracts and with

Multi-Disciplinary Independent Review Teams. The Selection Committee included Colonel VanMaldeghem. (Zimmerle Depo. Tr.@ p. 45, Lines 16-25; p. 46, Lines 1-9). Mark Alexander, the individual selected, informed Lyons that because he was personal friends with both Creasy and with VanMaldeghem, Alexander felt confident he would receive the position (Lyons Depo. Tr. @ p. 178, Lines 3-17), despite his lack of relevant experience. (See Pl. Ex. A). No documents as to criteria, applicant resumes, applicants' scoring, ranking of interviewees, or other deliberations exist. Lyons did not receive an interview. Only four men were interviewed for this position. Plaintiff points out that, while the announcement was sent to Robert Balcerek, he evidently was not qualified for the position and did not get an interview. (See Pl. Ex. A). VanMaldeghem recommended and Creasy concurred with awarding Alexander the position. (Memorandum for Air Force Committee, Pl. Ex. WW).

Lyons received notice of the other two positions, the GS-14 AFMC/JA and the GS-15 AFMCLO/JANS and formally filed an EEO complaint on September 2, 2011, specifically naming Creasy and Thrasher. (Sept. 2, 2011 Complaint of Discrimination, produced during discovery, attached as Exhibit XX).

In Fall 2011, Lyons requested additional work, namely to be placed on the standing Source Selection Advisory Committee (September 7 and October 6, 2011 e-mails from Lyons, Pl. Ex. YY), contrary to Zimmerle's statements that Lyons does not seek to broaden her experience (Zimmerle Depo. Tr. @ p. 25, Lines 24-25; p. 26, Lines 1-3) and Ditalia's statements that she "creatively refuses to do work. (Summary of Ditalia's Statement to EEO, Pl. Ex. ZZ). In December, her request was denied with three men being named to the available positions. (December 14, 2011 email from Martin, Pl. Ex. AAA).

In April 2012, only days after the 180 day time period for investigation of the September 2, 2011 EEO Complaint had lapsed without investigation, Colonel Graeme Henderson told Lyons that Creasy had decided to "lateral" Zimmerle from AFMC/JA into the AFMCLO/JANA due to an impending Reduction in Force and reorganizations. (April 6, 2012 emails from Lyons, Pl. Ex. BBB). However, after Lyons questioned why no force reductions or reorganizations had been announced, these reasons changed. (Lyons' Third EEO Complaint, dated May 21, 2012. Pl. Ex. CCC). Instead, according to Creasy, Zimmerle was placed in AFMCLO/JANA, because she lacked leadership experience (Creasy Declaration, Pl. Ex. DDD), a statement consistent with Zimmerle's statements on her arrival in AFMCLO/JAN, but which she later denied. (Zimmerle Depo. Tr.@ p. 7, Lines 5-13). According to Zimmerle in April 2011, Creasy promised if she came to AFMCLO/JAN, she would receive experience necessary for the senior executive service position open in his office. (See Pl. Ex. A).[3]

On May 17, 2012, Lyons filed a complaint in the United States District Court for the Southern District of Ohio alleging gender-based discrimination in refusing to grant her an interview for the Attorney-Advisor position posted on November 29, 2010 announcing the opening of the AFMC/JA GS-14 slot, claiming retaliation for engaging in protected activity.  A second claim in this complaint asserted discrimination in the JAN vacancy publicized in the February 16, 2011 email and awarded on March 30, 2011.  A third claim asserted gender based discrimination based on the decision not to promote her to the AFMC/JA position announced on April 8, 2011.  Doc. 1 at 14, 15, PageID 14-15.

---

3 Lyons would also have the Court read page 8 of Zimmerle's deposition to support statements made by Janice Beckett to Lyons. Doc. 38, 15. Page eight of Zimmerle's deposition has not been filed with the Court. Even if it had, this would constitute hearsay that cannot be considered on summary judgment.

By lateraling Zimmerle to AFMCLO/JANA, Creasy had avoided competing the GS-15 position, the very one Lyons was holding as a GS-14 and the position, "acting Branch Chief," historically used to successfully compete for the GS-15 Branch Chief position, a path followed by both Ditalia and Klein. This 2012 lateral allowed Creasy to avoid competition, where Lyons would be a competitive applicant. Creasy then did what was referred to as "a lateral" of Robert Balcerek into Zimmerle's vacated position (in the same office, where the previous year, he did not qualify). This "lateraling" reasoning was changed, when Lyons questioned how an individual not in Creasy's command could be a "lateral" into AFMC/JA. Instead, the reasoning became that Balcerek was on a "surplus" list. (Summary of Creasy's Statement to EEO, Pl. Ex. EEE). Lyons filed EEO claims regarding these moves on July 19, 2012. (July 19, 2012 Complaint of Discrimination, Pl. Ex. FFF).

During the EEO investigation, Creasy provided a short explanation for both actions, but emphasized the creation of a new Acquisition Ethics Branch within AFMCLO and the fact that a new AFMC LO/JANE GS-15 position would then "be competed and any current employee (would be) eligible to compete". (See Pl. Ex. EEE). In Summer 2012, Creasy directly began managing AFMCLO/JAN. (18 July 2012 Memorandum for Director, Pl. Ex. GGG).

Lyons' fourth failure to promote claim concerns a position announced on October 5, 2012, as the Acquisition Ethics Branch Chief, AFMC LO/JANE GS-15. (Supervisory Attorney Advisor (Contract) ... 759314, Pl. Ex. Ill). While the announced position was "Supervisory Attorney Advisor (Contracts)," the Questionnaire to be answered and submitted with applications had no questions on supervisory experience and only one on basic contracts. (See Exhibit III). Due to the disparity between the announced position and the questions, numerous interested applicants had

10

negative reactions. (Klein Depo. Tr. @ p. 28, Lines 2-25; p. 29; p. 30, Lines 1-5). In response, Henderson, director of AFMCLO/JAN, called an "all hands" meeting on October 11, 2012 (Oct. 11, 2012 email from Henderson, Pl. Ex. JJJ), where he stated that Creasy had written the Announcement and that Henderson did not intend to follow the announced criteria religiously. (*Id.* and Burris Depo. Tr. @ p. 14, Lines 8-24). The next day, Lyons e-mailed management, documenting concerns regarding the announced position, the questions, and the choice not to follow the announced criteria. In that email, sent prior to the announcement's close date for applications, not during the selection process as Defendant has argued at p. 17, Lyons stated that the Announcement was "laser targeted for one individual," Sigurd Peterson. (October 12, 2012 email from Lyons, produced during discovery, attached as Exhibit KKK).

On October 12, 2012, Doyon appointed the Selection Committee to include Ditalia whom Lyons named in her EEO Complaints. (Memo For Record, Pl. Ex. LLL). The committee discussed not only applicants, but also was warned to maintain good records of the process because of the anticipation of an EEO filing. (September 25, 2013 email from Sims et al, Pl. Ex. MMM). One can easily surmise that the concern over an EEO filing stemmed from Plaintiff's pending litigation and repeated EEO complaint from the last few times GS-15 openings had been announced.

On October 15, 2012, Lyons had a mid-term feedback session with Zimmerle, who during the meeting, acknowledged management's receipt of Lyons' e-mail and management's opinion that there had been no impact from Lyons' prior EEO activities, so there was no reason to do anything differently. On October 16, 2012, Henderson did address Lyons' e-mail, contradicting his previous meeting statements and asserting that the announcement was "accurate" and "its content speaks for itself." (October 16, 2012 email from Henderson, Pl. Ex. 000).

11

On October 24, 2012, Lyons' package was sent to the committee (October 24, 2012 email from Vacancy, Pl. Ex. QQQ), who deemed Lyons as highly qualified. In fact, the committee ranked Lyons as tied for sixth on the list, and with their determination not to interview Pupko, she and another candidate tied for fifth. (JANE GS-15 Position Rank Order, Pl. Ex. RRR). Despite this ranking, Lyons was not interviewed; rather, the committee interviewed five people, including the person with whom Lyons had tied on the list. Henderson stated his reasons for not interviewing Lyons as her lack of professional military education; however, Lyons, as a Reserve Lieutenant Colonel Retired, had completed both Squadron Officer's School and Air Command and Staff College. (Exhibit TTT).

On November 26, 2012, Henderson e-mailed Lyons that she had not received the position (November 26, 2012 email from Henderson, Pl. Ex. VVV), and the following day, Doyon announced Peterson had received it. (November 27, 2012 email from Doyon, Pl. Ex. WWW).

On March 1, 2013, Lyons formally filed an EEO Complaint. Prior to this time, during the fall of 2012, Zimmerle, who had been having Lyons function as acting Branch Chief in her absence, informed Lyons that Henderson had decided these responsibilities had to be rotated among the Branch's attorneys. In March 2013, Zimmerle was out of the office and had Anthony Dattilo as acting Branch Chief with no rotation. When Lyons questioned Zimmerle about this (June 12, 2013 email from Lyons et al, Pl. Ex. XXX), Zimmerle informed her that Henderson had made the decision to make Dattilo permanent acting Branch Chief back in March 2013. (Handwritten Note, Zimmerle memo to file June 20, 2013, Pl. Ex. YYY). Lyons emphasizes that this was after the filing of her EEO Complaint. When Lyons asked Henderson to confirm the decision (June 28, 2013 email from Lyons, Pl. Ex. AAAA), he stated no such position (Acting

Branch Chief) existed, but described the position's responsibilities and stated Zimmerle had made the decision. (July 2, 2013 email from Henderson, Pl. Ex. BBBB).

Lyons asked Doyon about the decision, specifically noting the history of this position leading to promotion. (July 10, 2013 email from Lyons, Pl. Ex. CCCC). On July 17, 2013, Doyon confirmed his approval of the decision. When Lyons asked about the position's history, Doyon stated she needed "a reality check" and cautioned her to "stop playing these games," as she was "the only individual demonstrating hostility" in the office. (See Pl. Ex. A; Memo for Record: Doyon-Lyons Meeting, Pl. Ex. DDDD). While stating she could apply for future positions, he also stated hiring committees were looking for leadership skills, which he stated Lyons, a former Air Force Reserve Lieutenant Colonel, lacked. (See Pl. Ex. DDDD). Doyon made these statements during his explanation of his decision to deny Lyons, yet again, an opportunity to gain the very leadership skills he claimed she lacked.

During the aforementioned communications, on July 9, 2013, Lyons filed another complaint in this Court, now claiming hostile work environment gender discrimination and reprisal for the hiring of the branch chief for AFMC LO/JANA announced on April 9, 2012 and a AFMC/JA GS-15 position announced in May 2012. See 3:13-cv-00221, Doc. 1.

These claims were consolidated into the first filed case, with an amended complaint asserting all of the previous claims. Doc. 29, ¶ 113.

## II.     Standard

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and associated case law.  Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.*, at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S., at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S., at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true

the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S., at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not…obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties.

## III. Analysis

Title VII of the Civil Rights Act of 1964 prohibits federal agencies from employment discrimination "based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–16(a). It is a violation of Title VII to fail to promote an employee because of his or her membership in a protected class. See, e.g., *White v. Columbus Metro. Hous. Auth.,* 429 F.3d 232, 240 (6th Cir. 2005). Plaintiff asserts she was discriminated against because of her gender.

A plaintiff may establish a claim of discrimination either by presenting direct evidence of discrimination or by presenting circumstantial evidence that would support an inference of discrimination. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). Direct evidence is where an employer's statement directly shows discriminatory motive. See *Schlett v. Avco Fin. Servs., Inc.*, 950 F. Supp. 823, 828 (N.D. Ohio 1996). The Sixth Circuit stated in *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994), that evidence that would

15

require the jury to infer a fact is not direct evidence. Direct evidence, in the form of verbal comments, will be similar to an employer telling its employee, "I fired you because you are disabled." *Smith v. Chrysler Corp.,* 155 F.3d 799, 805 (6th Cir. 1998). Lyons has no direct evidence that any of the actions of which she complains were motivated by gender, leaving her to only the avenue utilizing circumstantial evidence established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973) to survive summary judgment.

Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973), when a claim is based on circumstantial evidence, a plaintiff must first establish a *prima facie* case of discrimination, the elements of which vary slightly depending on the theory asserted. To establish a *prima facie* case of discrimination based on a "failure to promote" theory, a plaintiff must demonstrate that:

> (1) she is a member of a protected class; (2) she applied for and was qualified for a promotion; (3) she was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time plaintiff's request for the promotion was denied.

*White*, 429 F.3d at 240. A plaintiff's burden at the *prima facie* stage is "not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

If the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for its adverse action. If the defendant satisfies its burden, the burden shifts back to the plaintiff to identify evidence from which a reasonable jury could find that the stated reason is a pretext for discrimination.

Defendant has asserted that in each promotion opportunity, it found another individual better qualified. Lyons asserts that she had better qualifications.

16

The Supreme Court has stated that "qualifications evidence may suffice, at least in some circumstances to show pretext." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006). In *Bender v. Hecht's Department Stores*, 455 F.3d 612, 626 (6th Cir. 2006), the Sixth Circuit held that the probative value of qualifications evidence in terms of demonstrating pretext must be balanced against "the principles that employers are generally 'free to choose among qualified candidates,' [quoting] *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987), and that '[t]he law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with,' [quoting] *Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1996)." Thus, "[w]hether qualifications evidence will be sufficient to raise a question of fact as to pretext will depend on whether a plaintiff presents other evidence of discrimination." *Bender*, 455 F.3d at 626. If there is a dearth of other evidence of discrimination, then to survive summary judgment, "the rejected applicant's qualifications must be so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former." *Id.* at 627.

A.      **Attorney-Advisor (Contract), GS0905-14 in HQ AFMC/JAQ**

With regard to the GS-15 position in AFMC/JAQ under Creasy that opened with Pippen's departure in April 2011, Plaintiff fails to demonstrate how the Defendant's articulated reasons for selecting John Pritchard (his years of litigation experience, among others) were a pretext for gender discrimination. When there is little or no other probative evidence of discrimination, to survive summary judgment "the rejected applicant's qualifications must be so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former. In negative terms, evidence that a rejected applicant was as

17

qualified or marginally more qualified than the successful candidate is insufficient, in and of itself, to raise a genuine issue of fact that the employer's proffered legitimate, non-discriminatory rationale was pretextual." *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 626-27 (6th Cir. 2006).

Plaintiff decries that she was not given an interview for the position, and highlights the Defendant's position that the Plaintiff simply was not one of the most qualified candidates for the position. In arguing that she was employed as an attorney for five years more than Pritchard, Plaintiff appears to conflate qualifications with years on the job. According to Colonel Doyon, the director of the Law Office, mere seniority is not determinative for a leadership position. (Def. Ex. 16, pg. 48, lines 11-15.)  Five more years' experience does not demonstrate that the Plaintiff's qualifications were so significantly better than Pritchard's qualifications that no reasonable employer would have chosen him over her.

**B.**    **Supervisory Attorney-Advisor (Contract) GS-0905-15 in HQ AFMC/JANS**

With regard to the February 2011 announced AFMCLO/JANS GS-15 position, Plaintiff focuses on the Defendant's statement that Pippen was an "easy lateral" for the position. Defendant's asserted non-pretextual reasons, that Pippen was at a higher level than the Plaintiff, had more experience and had been a team leader. Plaintiff does not address these criteria. Nor does she demonstrate how any of these criteria were used as a pretext for gender discrimination against her. Moreover, as Defendant points out, even the rationale of hiring an "easy lateral" is an acceptable, non-discriminatory reason for making a hiring decision. "Time and again we have emphasized that [o]ur role is to prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments." *Corell v. CSX Transp., Inc.*, (6th Cir. 2010).

**C.**     **Attorney-Advisor (Contract), GS-0905-15 in HQ AFMC/JA**

With regard to the March 2010 announced Attorney-Advisor (Contract), GS-0905-15 in HQ AFMC/JA, Plaintiff does not appear to contest the qualifications of the individual selected for this position, Mark Alexander. Alexander was highly qualified, and those qualifications were described by the Defendant contemporaneously to his hiring. Plaintiff takes issue with the selected individual's relationship to the hiring personnel. While Alexander had been a member of General Creasy's staff, and that that role would make his transition into the position easier, there is nothing unlawful about hiring someone with whom you are familiar. "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." S*t. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). Putting Alexander's qualifications aside, it cannot be said that Alexander having worked for the deciding official was a pretext for discrimination against Plaintiff.

**D.**     **Supervisory Attorney GS-0905-15 in AFMCLO/JANE**

With regard to the October 2012 announced position of Acquisition Ethics Branch Chief, AFMCLO/JANE GS-15, several witnesses offered testimony that Petersen had an interview that was better than any other candidate for the position.

Lyons focuses instead on the assertion that Army War College was required for the position and disputes the testimony of Stephanie Burris that "to be a supervisory GS15, I don't know if it's an AFMC or the Air Force, you need to complete Air War College or I know they also can waive that requirement. But if they waive it for a supervisory GS-15, someone gets promoted into that spot, you need complete it at some point." Def. Ex. 17, 23.   Lyons asserts she is currently enrolled in Army War College, and her seminar class includes three GS-15s from AFMCLO (and

19

the individual interviewed, instead of Lyons for the AFMCLO/JANE position) (See Pl. Ex. A). Presumably, all three individuals were awarded GS-15s with a waiver of this requirement, similar to the AFMCLO one. (Memorandum for HQ AFMC/Al L, Waiver of Training Requirement, dated Apr 21, 20 II, Pl. Ex. UUU). Thus, Defendant argues while such waivers may have routinely been granted in the past, in Lyons' case, such waiver would not be granted, making her ineligible for any GS-15 position.

Plaintiff offers no evidence to contradict Defendant's position that others interviewed better. Petersen's interview performance formed the basis of "a reasonably informed and considered decision," which is all that needs to be shown to defeat an argument on pretext. See *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 616 (6th Cir. 2003) (accepting a higher interview score as a legitimate, nondiscriminatory reason for a plaintiff's non-selection).

**E.    Hostile Environment**

Lyons' last two claims assert hostile work environment. One claim states that, "[i]n commenting on its intent to not follow the stated criteria in the position Announcement, in acknowledging Plaintiffs' prior EEO Complaints, and in stating its beliefs that the EEO had no impact on its actions, as referenced herein. Defendant… subjected Plaintiff to a hostile work environment." Doc. 29, ¶109. The second claim for hostile work environment asserts, "[i]n relieving Plaintiff of responsibilities without cause, in giving those responsibilities to a male attorney, and in commenting on Plaintiff's future potential for promotion along with stating that Plaintiff was 'playing games' as she was protecting her rights[,] Defendant…subjected Plaintiff to a continuing hostile work environment."

20

Plaintiff's opposition to the motion for summary judgment further details the actions she considers constitute a hostile work environment. In May, 2007, Ditalia told Lyons he would see her "finished in the office." In July 2010, Kline and Doyon warned of "further action" following Lyons' hosting a political event while listed as being out on sick leave. As Lyons recalls a September 2010 conversation with Thrasher,

> in regard to my future ability to be promoted, namely your comment that I "have previously asked to be promoted to management positions within the office," it was indicated that this situation in regard to my use of leave on this one particular occasion will be considered negatively in such decisions, and my having any future promotions was then called into question.

(September 10, 2010 email from Lyons, Pl. Ex. V). In March 2011 in his decision on Lyons' grievance, Creasy wrote

> b. I find no evidence to support your contention that Col Martin's decision to reprimand you constituted harassment by management in the AFMCLO. Col .Martin reviewed the facts and circumstances of your case and independently rendered her decision without either input or pressure from any other managers in the AFMCLO. Her decision was based on her impartial finding that you had inappropriately used sick leave, and that this type of leave abuse and lack of personal integrity required corrective action in the form of a reprimand. This action was solely based on a reaction to your misconduct, rather than an effort to harass you in any way.

Lyons also decries that Creasy, Thrasher and Doyon in one position after another, announced criteria, appointed hiring committees, and then filled the positions using unstated criteria. Lyons also describes it as hostility that her supervisor stated that her EEO activities had no impact on decision not to select her for openings. Lyons also puts in this category being told to "stop playing games" and to get a "reality check."

"The most fundamental problem with the allegations [Plaintiff] makes with respect to these individuals is that they fail to establish that the complained-of actions were based on [Plaintiff's gender]. None of the allegations made by [Plaintiff] contain any hint of facts that would permit a rational factfinder to infer that [gender] animus played a part in what appear to have been garden-variety personality conflicts between people…working in close quarters." *Perkins v. Harvey*, 368 Fed. App'x 640, 646 (6th Cir. 2010). The United States Supreme Court has noted that harassing conduct "must be extreme to amount to a change in the terms and conditions of employment[.]" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not create a hostile work environment. *Id.* (citation and internal quotation marks omitted). "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code." *Id.* (internal quotation marks omitted).  Far from running afoul of a civility code, the actions Lyons describes appear well within most civility codes, not to mention the pale established for hostile environment claims.

## IV.    Conclusion

Because Plaintiff has no direct evidence of discrimination and because Plaintiff cannot disprove Defendant's stated non-discriminatory reasons as pretext, and because the actions Plaintiff decries do not amount to a hostile work environment, Defendant's Motion for summary judgment is **GRANTED.   DONE** and **ORDERED** in Dayton, Ohio, this Wednesday, December 3, 2014.

The captioned cause is hereby **TERMINATED** upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

22

s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE